Filed 12/10/24  P. v. Zapata CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | E079285 |
| Plaintiff and Respondent, | (Super.Ct.No. INF 10000207) |
| v. | |
| CHRISTINA RENEE ZAPATA, | |
| Defendant and Appellant. | |
| THE PEOPLE, | E079410 |
| Plaintiff and Respondent, | (Super.Ct.No. INF 10000207) |
| v. | |
| CECILIA MORIN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dean Benjamini, Judge.

Affirmed.

Mary K. McComb, State Public Defender, Caroline P. Cincotta and Adriana Gonzalez, Deputy State Public Defenders, for Defendant and Appellant, Christina Renee Zapata.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant, Cecilia Morin.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Lynne G. McGinnis and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

Christina Renee Zapata and Cecilia Leanne Morin each pled guilty to two counts of second degree murder in 2013. They filed petitions for resentencing under Penal Code former section 1170.95, which has since been renumbered section 1172.6. (Unlabeled statutory citations are to the Penal Code.) The court held a combined evidentiary hearing and denied both petitions, finding that Zapata and Morin were major participants in an underlying felony who acted with reckless indifference to human life. (§ 189, subd. (e)(3).)

Zapata and Morin appeal from the order denying their petitions. They argue that the evidence was insufficient to establish their liability for felony murder because they had duress and necessity defenses to the underlying felony of robbery. They further argue that the record does not contain substantial evidence that they were major participants in the underlying robbery or that they acted with reckless indifference to human life. In a related vein, they argue that the court erroneously applied the legal

2

standards determining major participation and reckless indifference. Lastly, Morin

argues that we must remand the matter for the court to consider her youth in determining

whether she was recklessly indifferent to human life. We conclude that all of the

arguments lack merit, and we therefore affirm.

BACKGROUND

I.      *The evidence regarding the charged murders*

According to the evidence, Angel Esparza was the actual killer of the two murder

victims in this case. No witnesses testified at the evidentiary hearing on Zapata's and

Morin's petitions. The parties agreed to rely on transcripts of Zapata's and Morin's

interviews with law enforcement, the reporter's transcript of the joint preliminary hearing

in this case, and the reporter's transcripts of Zapata's and Morin's testimony at the

preliminary hearing and trial of Esparza. We derive the following factual background

from those transcripts.

A.      *Summary of testimony at the preliminary hearings and trial*

Zapata is Morin's mother. In December 2009, Morin, Morin's three children, and

Zapata lived together in a trailer in Thermal, California. Zapata was 39 years old, and

Morin was 23 years old. Morin's children were ages six, two, and one.

Zapata was on parole at the time. Morin rented the trailer and let Zapata live there

rent free. Morin and Zapata did not get along well and argued frequently. They were

both using methamphetamine daily.

Morin had known Esparza since she was 15. He dated her aunt (Zapata's younger sister) for years, and Morin and Zapata considered him to be family. Morin and Esparza also "h[u]ng out with same crowd" and had many friends in common. Zapata had known Esparza for more than 10 years, although she could not say precisely how many years. She first met him because she and his mother were friends; he was 15 or 16 years old when she met him, and it was later that he dated her sister.

Morin's aunt asked Morin to let Esparza stay at the trailer temporarily. Esparza was on the run and hiding from law enforcement. Morin agreed to let him stay, even though she and Zapata had heard on the television and radio that Esparza was wanted for murder. Morin would have done the same for any of her family members.

Zapata did not want Esparza to stay with them, because she knew "it was going to be a problem." She was on parole, and she was concerned that Esparza's presence would affect her parole status. But Morin permitted him to stay against Zapata's advice. As Zapata described it: "We gave him the benefit of the doubt. You know, we've known him since he was a kid, you know, and we gave him the benefit of the doubt. And that's why we opened our doors to him, because we considered him family. My daughter considered him family."

On December 19, 2009, Esparza had been staying at the trailer for a couple of days. Zapata was mad because he had been going outside during his stay, and she told him to stay inside. Morin's children were not at home that day, and she was using methamphetamine throughout the day and night. Morin limited the number of visitors to

4

the trailer because she did not want anyone to see Esparza and turn him in. But she was engaged in prostitution at the time and received a call from two men looking to pay for sex. She initially refused the men because she did not want them to see Esparza. They called again and said rude and degrading things to her; Esparza was sitting next to her while she was on the phone. The men then showed up at her trailer and parked their car, and she invited them in. Esparza "pretty much knew the situation" when they arrived, because he was there when she talked to them on the phone. The two men were Gregorio Juarez and Pedro Garcia, the murder victims in this case. Zapata was outside talking to someone and did not see the victims when they arrived. Esparza was in Zapata's bedroom.

Morin took the victims to her room, and roughly five minutes later, Esparza burst into the room with a revolver. Morin said that before that point, she did not have any indication that a robbery was going to happen. Esparza pointed the gun at the victims and ordered them to the floor. The two men lay down on their stomachs. Esparza and Morin tied up the victims. They used a belt, wire from a heater in the kitchen, and torn pieces of clothing. Morin said that she helped Esparza "because it was already happening," and she "just followed through."

Zapata returned to the trailer and knocked on Morin's bedroom door after the victims were tied up. Zapata got "really upset" when she saw them—she was upset about "everything that's happening, the way it's happening, how it's being done in there at the residence." She was also upset with Esparza. She was not going to call the police, but

5

she "wanted everybody out." She told Esparza and Morin that they were "being sloppy" and started yelling profanities at them. Specifically, she said: "'This shit needs to get the fuck out of here because it's like, you know, there's consequences to this. This shit's sloppy. Get it out of here. You've got ten minutes to get it out of here. Get it out. Take it somewhere else.'" Morin was on the bed crying.

Zapata saw that Esparza had a gun at some point during the incident, but she never saw him point the gun at the victims. She had duct tape in her belongings and gave it to Morin, and Morin covered the victims' mouths and eyes with the tape. Esparza told Zapata to check the bindings on the victims to ensure that they were secure. She complied and told him they were secure, because she wanted the "whole mess out of there."

Esparza went through the victims' pockets and asked them where they lived and whether they had family. He took money and a credit or ATM card from the victims. He asked one of the victims for the PIN number for the card, and Morin took the tape off the victim's mouth so that he could respond.

Esparza gave Morin the victim's ATM card. Zapata and Morin drove the victims' car to a market, and Morin tried to withdraw money at the ATM there but was unable to do so. Esparza stayed at the trailer with the victims. Zapata recalled going to the market with Morin that day, but she did not recall when or whether Morin tried to use the ATM card. When they returned from the ATM, Esparza was upset that Morin could not withdraw any money, and he beat both victims. Morin and Zapata used

6

methamphetamine, and Morin told one of the victims that "everything" was "going to be over soon."

At some point, Morin and Esparza asked the victims where they lived, where they were from, and whether they had family. The victims said that they were from Mexico and in the country illegally. Morin asked the victims for personal information so that when they were freed, they would not call the police—"sort of an insurance policy." One of the victims begged Esparza not to kill them. Morin, Zapata, and Esparza discussed dropping the victims off near a border town in Mexico. Morin suggested the idea because the victims were undocumented, and she thought that border patrol would detain them. Morin thought that all three of them agreed to do that.

Morin also took pictures of the bound victims and sent them to Miguel Aguilar, Esparza's friend who was in prison. She asked Aguilar to call her. He called, and Morin told him what Esparza was doing. Morin told Aguilar because she did not want the situation to "escalate to something bigger," meaning murder. Aguilar talked to Esparza. Zapata also called Aguilar and told him what was happening, because she thought that he could convince Esparza "to get everybody out." She was yelling at Aguilar, telling him that she did not know what to do. Things had gotten "out of hand," and she was worried. She asked Aguilar what to do because she did not think that calling the police was a safe option.

Roughly four hours after the victims arrived, around 6:00 or 7:00 p.m., Esparza carried the victims to their car. The victims' hands and feet were still bound. Zapata

checked their bindings just before Esparza moved them to the car. Zapata and Esparza drove away with the victims while Morin stayed at the trailer. Zapata drove the victims' car because Esparza did not know how to drive a stick shift.[1] They drove to a nearby vineyard, where Esparza unloaded the victims. They left the victims there alive, according to Zapata.

Esparza did not tell Morin where they were taking the victims, but she thought that they were going to drop the victims off at the Mexican border town. That town was hours away, but Esparza returned 20 or 30 minutes later. Zapata dropped him off and drove the victims' car to pick up Esparza's girlfriend.

Morin asked Esparza about the victims, and Esparza merely said that they were "gone." Morin and Esparza did not talk any more about what had happened to the victims. Morin gathered the victims' belongings that were in the trailer—a phone, papers from their car, compact discs, and a shoe—and put them in a black bag. She gave the bag to Esparza and told him to "get it out of there." She also took a shower and dressed, because she had plans to see a friend that night.

Esparza contacted Zapata's boyfriend, Alex Villegas, and asked him to bring gas to the trailer. Villegas arrived at the trailer late that night, and he and Zapata went to the gas station to buy gas. Zapata did not know what happened to the victims' car after she

---

[1] According to Zapata's testimony at Esparza's preliminary hearing, she did not see the victims leave the trailer, and she did not drive them to the vineyard. She said that she left the trailer after she yelled at Esparza for being sloppy, and when she returned a short time later, the victims were gone. It was at Esparza's trial that she admitted driving the victims to the vineyard.

returned from picking up Esparza's girlfriend, but the car was gone when Villegas arrived. Esparza told Zapata that they needed the gas to refill the gas tank in the victims' car. Esparza, Zapata, and Villegas drove to the vineyard in Villegas's truck, and Esparza took the bag of the victims' belongings and the gas. Esparza directed Villegas, who was driving. When they stopped, Esparza got out alone with the black bag and the gas and walked into the vines. He disappeared for a few minutes and returned to the truck without the black bag and the gas. Zapata saw fire and asked what he did; he replied that the victims' car would not start, so he set it on fire.

The group returned to the trailer about 30 minutes after they left. At some point after they returned, Morin saw smoke coming from the vineyards. Morin's friend came over, and she continued to use methamphetamine. She awoke at noon the following day and noticed police activity in the neighborhood. She panicked and knew then that the victims were dead.

The victims' bodies were discovered in the vineyard at roughly 9:00 a.m. on December 20, 2009, about one-quarter to one-half mile away from the trailer. They were still bound and had duct tape covering their eyes and mouths, and the bodies were burned. Investigators also found two cell phones, burned papers, a black bag, and the remnants of a gas container in the vineyard. Esparza stayed at the trailer with Morin and Zapata for about two more days. Morin took him to a friend's house around December 21. Law enforcement arrested Esparza on December 24.

9

The autopsies of the victims determined that each of their deaths was caused by a gunshot wound to the head. There was no smoke in the lungs of the victims, indicating that they died before being burned. The victims' car was never found.

Law enforcement interviewed Zapata's boyfriend, Villegas, in January 2010. Villegas told law enforcement that his work shift ended at 11:00 p.m., and he arrived at the trailer between midnight and 12:30 a.m. on December 20, 2009. He was going to spend the night with Zapata, and on his way there, Esparza called and asked him to bring gas. Villegas stopped at a gas station on the way and bought the gas. When he got to the trailer, Esparza seemed paranoid and nervous. Esparza had a revolver in his waistband and asked for a ride. Villegas was "'really scared'" of Esparza and agreed to the ride. Zapata went with the two men. Esparza directed Villegas to the vineyard and said that he had a car stuck there. When they arrived, Esparza got out of the truck alone and disappeared into the vines with the gas container. Esparza returned about two minutes later. Villegas did not hear anything or see any smoke, and they returned to the trailer.

B.      *Summary of Morin's and Zapata's interviews with law enforcement*

Law enforcement investigators interviewed Morin and Zapata in early January 2010. The record includes transcripts of two interviews with each of them.

1.      *Morin's interviews*

Esparza had been staying with Morin and Zapata for three or four days at the time of the relevant events. Esparza was with Morin's aunt for many years, and Morin thought of him as an uncle. Morin's children were with friends or relatives because she

10

was "harboring a fugitive," and she did not want the children around. But Morin was not afraid of Esparza. She instructed him to stay inside the trailer during the day, but he did not listen to her. Morin and Zapata were fighting "a lot" about that. Zapata did not want Esparza staying at the trailer, because she was on parole. She said that Morin was "jeopardizing [her] freedom."

Morin told investigators that the victims called looking for her friend, who was a prostitute, and that the victims were rude and disrespectful to her. They showed up at her home several hours later, around 2:00 to 3:00 p.m. She was mad at how they treated her but let them inside. She did not know what Esparza was planning to do, and she and Esparza had no plan to rob them. According to Morin, "everything just happened."

Morin and the victims were in her bedroom when Esparza opened the door. One of the victims jumped up from his seat, and Esparza put a gun to the victim's temple; Esparza told him to get on the floor or Esparza would shoot him. Esparza also ordered the second victim to the floor, and he directed Morin to get some tape. He also asked if she had rope, and when she said no, he asked if she could get rope from the neighbor. Morin refused and "kind of . . . laughed," and she told him, "[S]elf-serve in this bitch." But she got the duct tape and used the tape to cover the victims' mouths and later their eyes. Zapata came into the bedroom after Esparza ordered the victims to the floor. She asked what they were doing, and Morin told her to "'shut up.'" Everything was happening fast, and Morin was panicking. Zapata was mad at Morin and said, "'Not in the house. Why would you do that? Why would you do that? Why?'" Esparza took

11

some wire from Morin's heater and removed a belt from one of the victims, and he, Morin, and Zapata tied up the victims.

Esparza searched the victims' pockets and asked whether they had money. Morin sat on the bed while Esparza searched them, and Zapata left the room for a short period. One of the victims had a small amount of cash but said that he had more money in his bank account. Morin and Esparza asked for his PIN number, and Morin "was told" to go to the ATM. Esparza threatened to kill the victim if he was lying about the PIN number, and the victim insisted that he was not. Esparza asked where the victim was from and whether he had any family. Morin also asked one of the victims if he had family, and he said that he had children in Mexico. He promised not to report them if she let him go, but she was not "in charge."

Morin went to the market and tried to withdraw money at the ATM there, but she could not. She told investigators that "we" went to the market, but she did not specify who accompanied her. When she returned, Esparza was very impatient, and she thought that he might settle for taking the victims' car. Morin suggested dropping the victims off in Mexico because they were undocumented. She did not want the victims to die. Esparza brushed off the suggestion and did not say whether he would do that.

Around 6:00 p.m., Esparza carried the victims to their car, and Zapata drove the car; it had a stick shift, and Esparza did not know how to drive it. Esparza told Morin that they were going to drop the victims off "in Mexico or whatever." He and Zapata left with the victims and returned in the same car approximately 30 minutes later. Esparza

told Zapata to pick up his girlfriend and child, and she did so while he stayed at the trailer with Morin. Morin and Esparza did not talk, but she knew the victims were "gone" and would "never come back." She was not scared at that point, and "reality" did not hit her until the next day when she had a "nervous breakdown." But that night, Morin took a shower, and her friend came over.

Esparza later gave Zapata a small amount of money to split with Morin. He did not threaten Morin to make her do anything. He asked her to do something, and she did it. She was not afraid of him, but she was afraid that he was going to see weakness in her. Everyone knew that she was "down . . . to kick somebody's ass," although she did not want a gun in her home, and she did not want to hold one.

### 2. *Zapata's interviews*

Zapata told investigators that she and Morin argued about Esparza staying with them. The police were looking for him, as well as "every guy in the neighborhood." But it was Morin's trailer, and she allowed Esparza to stay. Zapata also said that she was pressured into letting Esparza stay there; it was not because she was afraid of Esparza, but because people had asked that they let him stay there.

Esparza told Zapata that he was not going back to prison. He did not talk about robbing Morin's customers specifically, but he was "always talking about robbing," and he "wanted to rob . . . everybody." He was scrambling for money around the time he stayed with them and had already tried to rob someone, and Morin was "more or less" involved in that.

13

Zapata initially attempted to deny or minimize her involvement in the charged crimes. She was outside talking to the landlord when the victims arrived at the trailer. Zapata first insisted that she "walked in, . . . saw what was going on, walked right back out, went to [her] room," and "kept smoking dope." Esparza did not say that he was going to rob the victims, but once she "took a look at him," she knew—he had made up his mind, and "it was already over, done with." She "just [knew] something because the way [Esparza's] been talking, he's got to make this money."

On further questioning, Zapata admitted that she knocked on the bedroom door, saw the victims tied up on the floor, and saw Esparza holding a gun. Morin was shaking and "freaking" out, and Esparza was mad. Zapata had duct tape that she used for her tattoo work, and Morin asked Zapata for it. Zapata replied, "'You know where it's at.'" Esparza was pointing his gun at the victims and told Zapata to check their bindings, and she complied. She retied a loose binding. The victims were not fighting back, and Zapata told them that as long as they "stay all right," everything would be "all right." She "made them believe nothing was gonna happen." Zapata yelled at Morin and Esparza for being careless and "doing shit so sloppy and everything," and she and Morin started arguing.

At some point, they called Aguilar in prison. Aguilar was close to Esparza and was supposed to be able to talk him out of anything. Aguilar was "a soldier" in the Mexican Mafia hierarchy, and Esparza was supposed to answer to him, so Zapata thought that Esparza would listen to him. Aguilar suggested that Zapata "drive [the victims] out,"

14

and he reassured Zapata that Esparza would not do anything. Esparza said, "'But Aunt Tina, I wouldn't do that to you guys.'" Esparza promised her that he just wanted to use the victims' car and that he would drop them off and let them go. Zapata insisted that he promised not to kill the victims.

Esparza loaded the victims into their car, and Zapata went with him to drop the victims off at the vineyard. She accompanied him to ensure that the victims would be okay. Zapata did not drive the car, but she showed Esparza how to work the gears and the clutch. Esparza unloaded the victims at the vineyard and told them that they were going to stay there for a few hours; he also ordered them not to try to leave. The victims were alive when Esparza and Zapata left them at the vineyard. After that, Zapata left him at the trailer and took the victims' car to pick up Esparza's girlfriend and baby. When she returned, Esparza took the victims' car and returned without it; someone named "Danny Boy" brought him back. She asked Esparza what he did with the victims' car, and he told her not to worry about it.

Esparza asked Zapata when her boyfriend was getting off work. Zapata replied that Villegas was already on his way to the trailer. Esparza called Villegas and asked Villegas to bring gas to refill a car's tank. Villegas asked to talk to Zapata and questioned her about the gas; she also told him that the gas was to refill a car. She told Villegas to "just buy it, just get it for him."

Esparza had a black plastic bag, and Morin put some of the victims' belongings in it. Zapata got mad and told Esparza that he "better not have done anything" to the

15

victims. Esparza said, "I didn't. I wouldn't do that to you." When Villegas arrived, Esparza asked for a ride. Villegas was "scared shitless" of Esparza and agreed to drive him. Villegas told Zapata to stay at the trailer because she was pregnant and had started bleeding, and she thought that she was losing the baby. Zapata insisted on going with them because Esparza had a gun, and she feared that he would do something to Villegas so that he could have Villegas's car.

Villegas drove the three of them to the vineyard, where Esparza got out of the car alone and walked into the vines. He told Zapata to make sure that Villegas did not leave him. Villegas was shaking and felt that something was wrong. Zapata told him that she also felt something was wrong but to let Esparza "do what he got to do." They did not hear any gunshots. Villegas and Zapata saw fire, and Villegas started to panic and said that he did not trust Esparza. Zapata told him, "'It's okay, it's okay.'"

Esparza later gave Morin $40 and gave Zapata $100, because Zapata was mad at him and he did not want her to "tell on him." Zapata called a sheriff's deputy the day after the victims' bodies were found, and she told the deputy that Esparza was in town and "in a desperate state." She asked the deputy to pick up Esparza but did not tell the deputy that Esparza killed the victims, even after he asked about the bodies found nearby. When the investigators asked why she did not call the police "when all this was going on," she said that she did not "think it had got[ten] that far that night." She intended to tell the deputy what had happened, but she could not bring herself to do it when she called him.

Zapata told the investigators that she and Morin did not help Esparza in order "to be tough," and they did not need the money. She stated: "He had the gun, what could we do? He promised that he wasn't gonna do that to them." She also said that by the time she became involved, "it was already too late," Esparza was not going to "turn back," and he would not listen to anyone.

II.    *Zapata's and Morin's convictions and sentencing*

The People filed a felony complaint against Zapata and Morin in January 2010, and they were held to answer at a preliminary hearing in May 2012.

In June 2012, the People filed an information charging Zapata and Morin with the deliberate and premeditated murders of the victims. The information also alleged that defendants committed the murders while they were engaged in robbery or attempted robbery. (§ 190.2, subd. (a)(17)(A).) As to Zapata, the information further alleged that she committed the murders while she was engaged in kidnapping or attempted kidnapping. (§ 190.2, subd. (a)(17)(B).) In addition, the information alleged that Zapata had three prior strikes and three prior convictions for which she served a prison term. (§§ 667, subds. (c), (e)(2)(A), 1170.12, subd. (c)(2); former § 667.5, subd. (b).)

In August 2013, both Zapata and Morin pled guilty to two counts of second degree murder. They did not admit any of the special circumstance allegations, and Zapata did not admit any of the prison prior or prior strike allegations. The record does not include a reporter's transcript of the plea hearing, but according to the minute orders from the hearing, the trial court struck the language in the information alleging premeditation and

17

deliberation.[2]  Zapata and Morin initialed the section in their plea agreements stating: "Factual Basis:  I agree that I did the things that are stated in the charges that I am admitting."  The court found that the "crime report" provided a factual basis for the pleas.[3]  (Capitalization omitted.)  Both Morin and Zapata agreed to testify in the case against Esparza as part of their plea agreements, and they did so at his preliminary hearing in September 2013 and his trial in March 2014.  The court sentenced both defendants to two concurrent prison terms of 15 years to life.

III.     *Zapata's and Morin's petitions for resentencing*

In 2019, Zapata and Morin filed petitions for resentencing under section 1172.6.  The court issued orders to show cause why Zapata and Morin should not be resentenced.  The People filed a brief arguing that Zapata and Morin could still be convicted of murder, because they were major participants in an underlying robbery or kidnapping and acted with reckless indifference to human life.  (§ 189, subd. (e)(3).)  Zapata's and Morin's

---

[2]     The minute orders reflect that the court struck the robbery-murder special circumstance allegations against both defendants, the kidnapping-murder special circumstance allegations against Zapata, and the prison prior and prior strike allegations against Zapata.  Both counts in the information alleged murder, the robbery-murder special circumstance, the kidnapping-murder special circumstance (as to Zapata), prior convictions (as to Zapata), and nothing else.  The minute orders state that the court struck "Enhancement(s) J1" and "Enhancement(s) C9" in counts one and two of the information.  The minute order as to Zapata separately states that "Prior(s) 01," "02," and "03" were stricken.  Thus, the minute orders' striking of the "Enhancement(s)" in addition to Zapata's "Prior(s)" must refer to the special circumstances, because the information did not allege any enhancements other than the special circumstances and Zapata's prior convictions.

[3]     The record does not contain an arrest report or any other report that could be construed as the crime report.

18

briefs argued that the evidence did not show beyond a reasonable doubt that they were major participants in an underlying felony and acted with reckless indifference to human life.

The court denied Zapata's and Morin's petitions at a combined hearing in June 2022, finding beyond a reasonable doubt that they were major participants in an underlying felony and acted with reckless indifference to human life. The court explained its ruling at length but observed that it would not provide an "exhaustive list" of the reasons for its ruling or cite every piece of evidence that supported the ruling.

The court first noted that there was some evidence that Morin had lured the victims to the trailer to set up a robbery by Esparza. But the "better interpretation" was that Morin was merely acting as a prostitute and did not preplan the robbery with Esparza. However, both defendants decided to harbor Esparza, who they knew was a dangerous and violent criminal.

The court also observed that there was no evidence that Zapata and Morin wanted the victims to be killed, but the question was not whether they acted with intent to kill. Both defendants were aware that the victims were in grave danger. The court commented: "It's very difficult to take the position that you didn't know what was going to happen when you are so scared that it is going to happen and you say that you took actions to prevent it. Those things just don't go together." The evidence showed that Zapata and Morin made some efforts to prevent the victims' death, like calling Aguilar "to calm things down because everyone was so scared . . . of what might happen next."

19

Morin said that she was afraid the situation would escalate to murder, and that was why she called Aguilar.

The court further explained that Zapata and Morin participated significantly in the crime and in an ongoing manner for hours. Esparza had a history of violence and was increasingly violent from the moment he entered the room, and the situation was getting out of control. But Zapata and Morin continued to be part of the incident by choice. It was not as though they left the scene after helping to bind or gag the victims. Morin took the victim's bank card and attempted to use it, but she did not take that opportunity to call the police while she was away from Esparza. And there was "some evidence that maybe" Zapata also went with her to use the bank card.

As to Morin's failure to call the police when she was away from the trailer, the court stated: "She says she didn't do it because she was scared, but that just highlights her actual subjective fear, her actual subjective knowledge of what was going on. Being scared of not helping doesn't excuse one from not helping. It doesn't take you away from being a major participant. It doesn't take you away from acting with reckless indifference to human life." The court found that Zapata similarly knew of the dangers "'beyond those inherent in any armed robbery.'" She knew that Esparza was contemplating killing the victims, and she was even scared of her boyfriend being alone with Esparza, "[b]ecause she had subjective knowledge of what was going to happen under the circumstances."

20

The court also addressed the claimed plan to drop the victims off at the Mexican border town. The court believed that Zapata and Morin wanted that to happen, but there was no credible evidence that Esparza had agreed to that plan. As the court explained: "It just defies logic. And Mr. Esparza is wanted for murder, hiding out from the authorities, trying to keep out of the public's eye, [he] is suddenly going to agree to letting these two men, who he has robbed, beaten, gagged, stolen from, just walk off unharmed into the sunset. It defies all logic. It just does not have any credibility whatsoever." The court concluded that a reasonable person aware of all the facts would not entertain an honest belief that Esparza intended no harm to the victims.

Lastly, the court addressed which crime was the underlying felony. It observed that robbery, carjacking, and kidnapping were all possibilities, but the strongest evidence showed that it was robbery. Esparza was still in the process of robbing the victims when he took them to the vineyard in their car and then drove off with their property.

After Zapata and Morin appealed from the court's order denying their petitions, we consolidated their appeals for purposes of briefing, oral argument, and decision.

DISCUSSION

I.      *Murder liability and Senate Bill No. 1437*

Under the first degree felony-murder rule at the time of defendants' convictions, "'when the defendant or an accomplice kill[ed] someone during the commission, or attempted commission'" of certain enumerated felonies, "the defendant could be found guilty of the crime of murder, without any showing of 'an intent to kill, or even implied

21

malice, but merely an intent to commit the underlying felony.'" (*People v. Strong* (2022) 13 Cal.5th 698, 704 (*Strong*).) "Then, as now, a defendant convicted of first degree murder could be punished by a sentence of death or life without possibility of parole if the trier of fact found the murder's commission involved one of several statutorily defined special circumstances." (*Ibid.*) One of those special circumstances, the felony-murder special circumstance, "applies to certain murders committed in the course of one of a dozen of the most serious felonies." (*Ibid.*; § 190.2, subd. (a)(17).) The special circumstance "applies to some convicted murderers who neither killed nor intended to kill, namely, 'major participant[s]' in the underlying felony who acted 'with reckless indifference to human life.'" (*Strong*, at p. 704, quoting § 190.2, subd. (d).)

The Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) "'to more equitably sentence offenders in accordance with their involvement in homicides.'" (*People v. Curiel* (2023) 15 Cal.5th 433, 448.) Effective January 1, 2019, the new law eliminated the natural and probable consequences doctrine for murder and narrowed the definition of first degree felony murder. (Stats. 2018, ch. 1015, § 1, subd. (f); §§ 188, 189.) As relevant here, Senate Bill 1437 narrowed first degree felony murder by adding section 189, subdivision (e), which provides that a "participant in the perpetration or attempted perpetration of a [qualifying felony] in which a death occurs is liable for murder" if the People prove that the "person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3).) Subdivision (d) of section 190.2

22

is the provision defining the felony-murder special circumstance. (*Strong*, *supra*, 13 Cal.5th at p. 708.) The new law thus repurposed preexisting law governing the felony-murder special circumstance to define first degree felony murder. (*Id.* at p. 703.)

Senate Bill 1437 also created a procedural mechanism for those convicted under prior law to seek retroactive relief under the amended law. (§ 1172.6; *Strong*, *supra*, 13 Cal.5th at p. 708.) Under section 1172.6, "the process begins with the filing of a petition containing a declaration that all requirements for eligibility are met (*id.*, subd. (b)(1)(A)), including that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to . . . Section 188 or 189 made effective January 1, 2019,' the effective date of Senate Bill 1437." (*Strong*, at p. 708, quoting § 1172.6, subd. (a)(3).) If the court determines that the petitioner has made a prime facie case for relief, then the court shall issue an order to show cause and hold an evidentiary hearing. (§ 1172.6, subds. (c), (d)(1); *Strong*, at pp. 708-709.) At that hearing, the People bear the burden of proving beyond a reasonable doubt that the petitioner is guilty of murder under the law as amended by Senate Bill 1437. (§ 1172.6, subd. (d)(3); *Strong*, at p. 709.) The court shall vacate the petitioner's conviction if the People fail to carry their burden of proof, and the court shall resentence the petitioner on any remaining charges. (§ 1172.6, subd. (d)(3).) If murder was charged generically, and a target offense or underlying felony was not charged, then the "petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes." (*Id.*, subd. (e); *People v. Arellano* (2024) 16 Cal.5th 457, 469.) "An 'underlying felony' refers to the felony

underlying a felony-murder theory [citations], and the 'target offense' refers to the offense the natural and probable consequence of which was murder." (*People v. Arellano*, at p. 470.)

On appeal from a court's order denying a section 1172.6 petition, we review the court's factual findings for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) We examine the record in the light most favorable to the court's order ""to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt."" (*Ibid.*) "'We presume in support of the [order] the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Brown* (2014) 59 Cal.4th 86, 105-106.) If the evidence reasonably supports the court's findings, then we may not reverse the order merely because the evidence might also reasonably support contrary findings. (*Id.* at p. 106.) "'We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.'" (*Ibid.*) "'Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support'" the court's findings. (*Ibid.*)

II.    *Duress and necessity*

Zapata and Morin argue that the People failed (1) to prove that defendants were not acting under duress when they committed the underlying felony, and (2) to negate the

evidence that defendants acted out of necessity when they committed the underlying felony. They argue that the People accordingly failed to prove that they were guilty of murder under the felony-murder rule, as amended by Senate Bill 1437. The argument lacks merit.

A. *The law of duress and necessity*

As already explained, murder liability under section 189, subdivision (e), requires that the defendant be a "participant in the perpetration or attempted perpetration" of certain underlying felonies (§ 189, subd. (a)). "'Although "duress is not a defense to any form of murder," [Citation] "duress can, in effect, provide a defense to murder on a felony-murder theory by negating the underlying felony. [Citations.] If one is not guilty of the underlying felony due to duress, one cannot be guilty of felony murder based on that felony."'" (*People v. Powell* (2018) 6 Cal.5th 136, 164; *People v. Anderson* (2002) 28 Cal.4th 767, 784 (*Anderson*) ["If the jury had found defendant not guilty of kidnapping due to duress (it did not), it could not have found that he killed during the commission of that kidnapping"].)

The duress defense is available to defendants who act "under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused." (§ 26, par. Six.) The defense requires a direct or implied demand that the defendant commit the crime. (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 567 (*Saavedra*).) In addition, the defendant must actually believe that their life or the life of another person was in immediate danger, and that belief must be

reasonable.  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 100; *People v. Heath* (1989) 207 Cal.App.3d 892, 900 (*Heath*).)  A fear or threat of future harm is not sufficient.  (*People v. Coffman and Marlow*, at p. 100; *Heath*, at p. 900.)  The immediacy requirement "negates an element of the crime—the intent to commit the act.  The defendant does not have the time to form criminal intent because of [the] immediacy and imminency of the threatened harm and need only raise a reasonable doubt as to the existence or nonexistence of this fact."  (*Heath*, at p. 901; *People v. Graham* (1976) 57 Cal.App.3d 238, 240.)  The People thus have the burden of proving beyond a reasonable doubt that the defendant had the requisite intent and did not act under duress.  (CALCRIM No. 3402.)

In contrast, the defendant must prove the defense of necessity by a preponderance of the evidence.  (*People v. Waters* (1985) 163 Cal.App.3d 935, 937.)  "Necessity does not negate any element of the crime, but represents a public policy decision not to punish [the defendant] despite proof of the crime."  (*Heath*, *supra*, 207 Cal.App.3d at p. 901.)  The defense "is available when the defendant reasonably believed there was a threat of harm and no other means to alleviate the harm."  (*Saavedra*, *supra*, 156 Cal.App.4th at p. 567.)  More specifically, the defendant must show that they "violated the law (1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which [they] did not substantially contribute to the emergency."  (*People v. Pepper* (1996) 41 Cal.App.4th

26

1029, 1035 (*Pepper*).) "An important factor of the necessity defense involves the balancing of the harm to be avoided as opposed to the costs of the criminal conduct." (*Heath*, at p. 901.) Unlike duress, the threatened harm may be in the future, so the defendant has time to balance alternative courses of conduct. (*Ibid.*) "The defendant has the time, however limited, to form the general intent required for the crime, although under some outside pressure." (*Ibid.*)

B.      *Zapata's and Morin's guilty pleas do not preclude their duress and necessity arguments*

As a preliminary matter, the People argue that Zapata's and Morin's guilty pleas to "second degree felony murder" conclusively established their guilt of an underlying felony, precluding any duress or necessity defense to the underlying felony. The People assert that although the pleas did not specifically identify the felonies underlying the "felony murder convictions," the record established that the felonies were robbery and/or kidnapping. We are not persuaded.

It is true that a "guilty plea admits every element of the charged offense." (In re *Chavez* (2003) 30 Cal.4th 643, 649.) But Zapata and Morin were not charged specifically with felony murder, and they did not plead guilty to felony murder. The information alleged generically that they committed premeditated and deliberate murder. The court struck the allegations of premeditation and deliberation at their plea hearing. The information also contained robbery-murder and kidnapping-murder special circumstance allegations, but the court also struck them, and neither Zapata nor Morin admitted those

27

allegations. Rather, they merely admitted that they "did the things that [were] stated" in the generic murder charges and pled guilty to second degree murder.

Those generic murder charges allowed the People to proceed on any theory of liability, including felony murder or natural and probable consequences. (*People v. Eynon* (2021) 68 Cal.App.5th 967, 978 (*Eynon*).) Zapata's and Morin's pleas admitted that the murders were committed and that they committed acts with the necessary intent to incur liability for those murders under some unspecified theory. (*Ibid.*) But they did not admit that they committed murder under a specific theory, nor did they admit a specific underlying felony or target offense. The facts of this case therefore stand in contrast to a case like *Eynon*, in which the defendant pled guilty to first degree murder and specifically admitted that the murder was committed during a robbery. (*Id.* at pp. 971-972.)

C.      *Substantial evidence that Zapata and Morin did not act under duress*

Although their guilty pleas do not preclude Zapata and Morin from asserting the duress defense, their challenge fails for another reason: The record contains substantial evidence that they did not act under duress during the robbery.

There was no evidence that Esparza expressly threatened their lives if they did not participate in robbery. And the court could reasonably conclude that there was no implied threat to their lives. The evidence showed that Esparza had known them for years and had a long-term relationship with Zapata's younger sister. Zapata and Morin considered him to be family and were harboring him because of that family-like

28

relationship, despite knowing of his capacity for violence. In Zapata's own words, he referred to her as "'Aunt Tina.'" The trial court could reasonably infer that Esparza would not threaten the lives of two women who were harboring him at great risk and with whom he shared such a relationship. Moreover, when Zapata came into the room and saw the victims bound on the floor, she got mad at Esparza and Morin, yelled profanities at them, told them that they were being sloppy, and ordered them to "'get it out of here'" and "[t]ake it somewhere else.'" The court could reasonably infer that Zapata would not have reacted that way to someone she believed would kill her, so she did not actually or reasonably believe her life was in danger. Similarly, the court could reasonably conclude that Morin did not actually or reasonably believe her life was in danger. She said that Esparza did not threaten her to make her do anything and that she was not afraid of him. Rather, she did not want him to see any weakness in her, because she apparently had a reputation for being tough.

There was also no evidence that Esparza threatened the lives of the victims if Zapata and Morin refused to participate in the robbery. The evidence showed that Esparza threatened to shoot one of the victims if he did not get on the floor and threatened to kill one if he was lying about his PIN number. But the threats were not conditioned on Zapata's and Morin's cooperation—the threats were conditioned on the victims' cooperation. The evidence also supports the reasonable inference that the victims' lives hinged on whether Esparza decided to eliminate them as potential witnesses who could report him to law enforcement. But the duress defense applies when

29

there is a threat to life if a defendant refuses to commit the criminal act. (§ 26, par. Six.) It does not apply merely because a defendant's confederate is threatening lives for other reasons.

Moreover, duress applies only if the "person being threatened has no time to formulate what is a reasonable and viable course of conduct nor to formulate criminal intent." (*Heath*, *supra*, 207 Cal.App.3d at p. 900.) "[A] person committing a crime under duress has only the choice of imminent death or executing the requested crime." (*People v. Condley* (1977) 69 Cal.App.3d 999, 1012.) The evidence here showed that the victims' lives were not in immediate danger and that Zapata and Morin had time to choose a reasonable alternative to robbery when they left the trailer with the stolen ATM card. Esparza was not with them, and there was no indication that he would immediately kill the victims in their absence, because he was waiting for Zapata and Morin to return with money. Yet Zapata and Morin did not halt their participation at that point—they went to the ATM, Morin tried unsuccessfully to withdraw money, and they returned to the trailer and told Esparza of their unsuccessful attempt. Those circumstances cannot reasonably be construed as showing duress.

In addition, "'if there was a reasonable, legal alternative to violating the law, "a chance both to refuse to do the criminal act and also to avoid the threatened harm,"'" then the duress defense fails. (*Heath*, *supra*, 207 Cal.App.3d at p. 900.) The record supports a reasonable inference that refusal to help Esparza was a viable alternative that Zapata and Morin could have pursued at any point. For instance, there was evidence that when

30

Esparza needed something to bind the victims and asked Morin to get rope from a neighbor, she refused and told him, "[S]elf-serve in this bitch." Esparza then found bindings for the victims on his own. Yet he did not kill them for Morin's refusal to help. Zapata's initial reaction to the crime also weighs against a showing of duress. Again, she was angry at Morin and Esparza for being sloppy and committing the crime in the trailer, and she ordered them to take the crime somewhere else. She did not show a concern that if she refused to participate, then Esparza would kill the victims.

For all of these reasons, substantial evidence supports the conclusion that Zapata and Morin did not participate in the robbery under duress.

D. *Failure to show that evidence of necessity compelled a finding in Zapata's and Morin's favor*

Zapata's and Morin's necessity argument also is unavailing. As already explained, they had the burden of proving the necessity defense by a preponderance of the evidence. "When the trier of fact has expressly or implicitly concluded that the party with the burden of proof failed to carry that burden and that party appeals," we do not review the court's conclusion for substantial evidence. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 279 (*Shaw*).) Rather, "'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.'" (*In re Raul V.* (2022) 82 Cal.App.5th 290, 300-301.) "Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'" (*Shaw*, at p. 279.)

31

Zapata and Morin have not shown that the evidence of necessity was uncontradicted and unimpeached and was of such a character and weight as to compel a finding in their favor. First, there was evidence that they had an adequate alternative to participating in the robbery—they could have refused, as Morin did when she refused to get rope for binding the victims, or they could have used their trip to the ATM as an opportunity to call the police. (See *People v. Kearns* (1997) 55 Cal.App.4th 1128, 1135 [the defendant failed to establish the absence of a reasonable legal alternative for the necessity defense, because she could have asked the robbery victim to call police rather than carry out the robbery].) Second, Zapata's and Morin's actions "substantially contribute[d] to the emergency." (*Pepper*, *supra*, 41 Cal.App.4th at p. 1035.) They helped by binding the victims and checking their bindings, covering their eyes and mouths with tape and providing that tape, and driving the victims to the scene where they were shot dead. All of those actions substantially contributed to the emergency situation in which the victims found themselves.

For these reasons, we conclude that defendants' duress and necessity arguments lack merit. Substantial evidence supports the determination that Zapata and Morin did not act under duress, and the evidence regarding necessity was not uncontradicted and unimpeached nor of such a character and weight as to compel a finding in their favor.

III.    *Major participant and reckless indifference findings*

Zapata and Morin argue that the evidence is insufficient to show that they were

major participants in the robbery who acted with reckless indifference to human life.  We disagree.

To review, the new definition of felony murder repurposes preexisting law governing the felony-murder special circumstance.  (*Strong*, *supra*, 13 Cal.5th at p. 703.)  Our Supreme Court examined that special circumstance in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).  "[W]hen Senate Bill 1437 amended Penal Code section 189 to incorporate major participation and reckless indifference requirements, it codified the understanding of those requirements elucidated in *Banks* and *Clark*."  (*Strong*, at p. 710.)

A. *Substantial evidence that Zapata and Morin were major participants in the robbery*

"*Banks* focused primarily on the major participant element."  (*Strong*, *supra*, 13 Cal.5th at p. 706.)  A major participant in a robbery is someone whose personal involvement is substantial and "greater than the actions of an ordinary aider and abettor" (*Banks*, *supra*, 61 Cal.4th at p. 802) but who might "not be the ringleader" (*People v. Williams* (2015) 61 Cal.4th 1244, 1281).  The *Banks* factors for evaluating the extent of participation include:  (1) the participant's role in planning "the criminal enterprise that led to one or more deaths"; (2) the participant's role in "supplying or using lethal weapons"; (3) the participant's awareness of the "particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants"; (4) the participant's presence "at the scene of the killing," whether they were "in a

position to facilitate or prevent the actual murder," and whether the participant's "own actions or inaction play[ed] a particular role in the death"; and (5) the participant's actions after the use of lethal force. (*Banks*, at p. 803.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

Beginning with Morin, the record contains substantial evidence that she was a major participant in the robbery of the victims. There is no evidence that she supplied the gun used by Esparza. Morin asserts that the record is clear that she did not plan the robbery, but there is some evidence that she did just that. Esparza needed money around that time, and she was "more or less" involved in an earlier attempted robbery with Esparza. The victims were rude to Morin and degraded her when they called, and Esparza was next to her when she had that phone conversation. Although she had been restricting visitors because she did not want anyone to see Esparza, she let the victims into the trailer when they arrived. That evidence supports a reasonable inference that Morin was upset with the victims; as her friend, Esparza was also upset; and in retaliation, they planned for her to invite the victims over so that Esparza could rob them. The court nevertheless determined that "the better interpretation" of the evidence was that Morin was merely acting as a prostitute and did not preplan the robbery with Esparza.

But even if Morin did not supply any lethal weapons or preplan the robbery, the remaining *Banks* factors weigh in favor of finding her to be a major participant. Morin was aware of the particular dangers posed by Esparza. She knew that he was wanted for a recent killing—he was staying at her trailer because he was on the run from law

34

enforcement. She also knew that he had a gun at least from the moment he burst into her bedroom, and she continued to participate in the robbery for roughly four hours thereafter. (The victims arrived at approximately 2:00 p.m., Esparza burst into the bedroom minutes after their arrival, and he loaded them into their car at roughly 6:00 p.m.) In addition to her awareness that Esparza was an armed fugitive, Morin knew that the events could escalate to murder—that was her claimed reason for contacting Esparza's friend, Aguilar.

And although there is no evidence that Morin was present when Esparza shot the victims, she was in a position to prevent the murders, and her own actions and inactions played a particular role in the murders. She helped to bind the victims' hands and feet and covered their mouths and eyes with tape, ensuring that they were detained and could not escape or call for help. She essentially stood guard over them with Esparza for the hours-long period they were held at the trailer. She did nothing when he beat the victims. Most notably, when she left the trailer to go to the ATM, Esparza stayed behind. But she did not use that clear opportunity to contact police and stop the crime.

Morin's actions after the use of lethal force also weigh against her. When Esparza returned from the vineyard without the victims only 20 to 30 minutes after he left, it was clear that he and Zapata did not drop the victims off at the Mexican border town, which was hours away. Esparza said only that the victims were gone, and Morin did not question him further. Any reasonable person in those circumstances would suspect that Esparza had killed the victims, given that he was already wanted for murder, trying to

35

hide from law enforcement, and armed with a gun. Yet Morin did not try to find out where the victims were or if they were harmed but could still be saved. She still did not call the police. Instead of doing anything that could potentially help the victims, she hid evidence of the crime by gathering the victims' belongings in a bag so that Esparza could dispose of them. Then she went ahead with her plans for the evening—she used methamphetamine, got dressed, and her friend came over. Even the next day, when Morin said that she knew the victims were dead because of all the police activity, she did not report the crime. She continued to harbor Esparza for at least another day and then took him to a friend's house.

Morin emphasizes that she was not at the scene of the killing and stayed at the trailer when Zapata and Esparza left with the victims, so she was not in a position to facilitate or prevent the murders when they happened. The argument fails to persuade. Under many circumstances, absence from the scene of the killing diminishes culpability for the death because "[t]hose not present have no opportunity to dissuade the actual killer, nor to aid the victims, and thus no opportunity to prevent the loss of life. Nor, conversely, are they in a position to take steps that directly and immediately lead to death," unlike defendants who capture and stand guard over victims. (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. 5.) All of that may be the case when the underlying felony and killing happen quickly, and the defendant is not present. That was the case in *Banks*, in which the defendant was the getaway driver in an armed robbery of a marijuana dispensary, was blocks away from the scene, and was not present for either the robbery or

36

the shooting. (*Id.* at pp. 795-796, 805.) But those circumstances are unlike those here. A reasonable trier of fact could conclude that during Morin's presence at the scene of the robbery for four hours, she squandered opportunities to aid the victims and prevent the loss of life and instead directly helped Esparza capture and subdue the victims. (See *People v. Montanez* (2023) 91 Cal.App.5th 245, 279 (*Montanez*) [even though the defendant was not "at the exact location of the shooting at the precise moment it occurred," he was at the scene for the sequence of criminal activity leading up to it, and he had the ability and opportunity to reduce the foreseeable risk that his confederate would use lethal force].)

As to Zapata, the record likewise contains substantial evidence that she was a major participant in the robbery. There was no evidence that she supplied the gun or planned the robbery in advance with Esparza. But like Morin, the evidence shows that Zapata knew of the particular dangers posed by Esparza. She knew that he was wanted for a recent killing and knew that he was a fugitive. She came onto the scene of the robbery very early in the four-hour ordeal and saw that he had the gun. And Esparza told her that he was not going back to prison, from which she could infer that he was willing to kill his victims so that they could not report his crimes.

In addition, Zapata, like Morin, was in a position to prevent the murders, and her own actions and inactions played a particular role in the murders. The evidence showed that Zapata checked the victims' bindings and tightened a loose one. She provided the duct tape used to cover their mouths and eyes. She told the victims that everything would

37

be "all right" and "made them believe nothing was gonna happen," despite her awareness of the dangers posed by Esparza. She checked their bindings again when Esparza loaded the victims into the car. Zapata thus ensured that the victims were detained and would not escape or call for help. And during their roughly four hours of detention, she also left the trailer to go to the ATM with Morin but did not use that opportunity to contact police. Instead, she later drove the victims to the vineyard with Esparza and left them there. Esparza told the victims that they were going to be there for a few hours, and he ordered them not to try to leave. And still Zapata did not try to help the victims after she and Esparza left them. She continued to follow his directions and went to pick up his girlfriend while he stayed at the trailer, squandering another clear opportunity to call the police and at least report the location of the victims, if not report Esparza.

Zapata's actions after Esparza's use of lethal force also weigh in favor of finding her to be a major participant. Later that night, when Esparza returned to the trailer without the victims' car, Zapata asked about the car. Esparza told her not to worry about it, and she did not question him further. She instead helped Esparza enlist her boyfriend to bring gas, telling Villegas to "'just buy it, just get it for him,'" after Villegas questioned the request. At the vineyard, she saw fire after Esparza walked into the vines and returned without the bag of the victims' belongings. Throughout all of those events, she purportedly failed to determine what had happened to the victims, despite knowing of the life-threatening danger Esparza posed to them and despite knowing that he intended to return to the victims. She did not try to determine whether they were alive or harmed.

38

She continued not to call the police and helped destroy evidence of the crime. And even a day later when she finally contacted the deputy, she did not tell him anything about the victims or the crime—she merely asked him to find Esparza.

Zapata emphasizes that she had no role in planning the robbery and argues that she is far less culpable than defendants who had a significant role in planning. But as already explained, no single *Banks* factor is dispositive, "nor is any one of them necessarily sufficient." (*Banks*, *supra*, 61 Cal.4th at p. 803.) The evaluation of whether she was a major participant "requires a 'fact-intensive, individualized inquiry.'" (*Montanez*, *supra*, 91 Cal.App.5th at p. 271.) She also asserts that because she was unaware of the robbery beforehand, her awareness of Esparza's proclivity for violence does not show that she was a major participant. The argument is meritless. Zapata did not merely stumble upon a robbery that concluded within seconds or minutes with an unexpected shooting. She came upon Morin and Esparza at an incipient stage of the crime, helped to secure and thus capture the victims, and then continued to participate for hours with an awareness of Esparza's history of killing. Her awareness of his proclivity for violence strongly supports the court's major participant finding.

Zapata additionally argues that there is insufficient evidence that she drove the victims to the vineyard, because the evidence on the point was conflicting and the court made no express finding on the issue. It is true that there was conflicting evidence about whether she drove the victims to the vineyard. But it is not our role to resolve conflicts in the evidence. The trial court was entitled to resolve that conflict by rejecting Zapata's

self-serving testimony that she did not drive the victims to the vineyard and credit her later testimony that she was the driver. And the court's failure to make an express finding on the matter is immaterial. As the court explained when it denied Zapata's and Morin's petitions, it did not cite every piece of evidence that supported its ruling. Zapata does not cite any authority showing that the court was required to detail every factual finding supporting its ruling, and we are aware of none.

Zapata further argues that her actions did not play a particular role in the victims' deaths or contribute to the risk to their lives, because she checked the bindings in response to Esparza's demands in order to prevent Esparza from "escalating" and to keep the victims alive. Similarly, she asserts that if she did drive the victims away from the trailer, she did so to ensure that the victims stayed alive. The argument fails to persuade. The major participant element is the actus reus requirement for holding a defendant liable for felony murder. (*Banks*, *supra*, 61 Cal.4th at p. 798.) Regardless of Zapata's claimed reasons for her actions, they were physical acts that aided Esparza and led directly to the victims' deaths. It was entirely reasonable for the court to conclude that she played a significant role in the victims' death by keeping them bound and driving them to a more remote location under the direction of an armed man wanted for murder.

In sum, the record contains ample evidence to support the court's finding that Zapata and Morin were major participants in the underlying robbery.

B.      *Substantial evidence of Zapata's and Morin's reckless indifference to human life*

"[T]he core of *Clark*'s holding rested on the reckless indifference element." (*Strong*, *supra*, 13 Cal.5th at p. 706.) A person acts with reckless indifference to human life when they "'knowingly engag[e] in criminal activities known to carry a grave risk of death.'" (*Clark*, *supra*, 63 Cal.4th at p. 616.) However, the mere fact that a robbery involves a gun, "on its own and with nothing more presented, is not sufficient to support a finding of reckless indifference to human life." (*Id.* at p. 617.)

Reckless indifference to human life involves subjective and objective elements. (*Clark*, *supra*, 63 Cal.4th at p. 617.) "The subjective element is the defendant's conscious disregard of risks known to him or her. But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities. Rather, recklessness is also determined by an objective standard, namely what 'a law-abiding person would observe in the actor's situation.'" (*Ibid.*; see also CALCRIM No. 540B ["A person acts with *reckless indifference to human life* when he or she engages in criminal activity that a reasonable person would know involves a grave risk of death and he or she knows that the activity involves a grave risk of death"].)

The *Clark* factors for evaluating reckless indifference overlap with the *Banks* factors. (*Clark*, *supra*, 63 Cal.4th at p. 615.) The reckless indifference factors include: (1) the defendant's awareness that a lethal weapon would be used in the felony, whether the defendant personally used a lethal weapon, and the number of lethal weapons used; (2) the defendant's "[p]roximity to the murder and the events leading up to it," and

41

whether they used opportunities to restrain the crime or aid the victim; (3) the duration of the felony and whether the murder "came at the end of a prolonged period of restraint of the victims"; (4) the defendant's knowledge of their confederate's likelihood of killing; and (5) the defendant's efforts to minimize the risk of violence. (*Id.* at pp. 618-622.) Like the major participant factors, no single factor is dipositive, nor is any one necessarily sufficient to show reckless indifference. (*Id.* at p. 618.)

Substantial evidence supports the court's finding that both Zapata and Morin acted with reckless indifference to human life. Neither defendant personally used a gun, but they were aware that Esparza had the gun early in the four-hour detention of the victims. Morin knew from the moment that Esparza burst into the room and ordered the victims to the floor at gunpoint. Zapata saw that Esparza had a gun when she first entered the room and saw the victims subdued on the floor.

Zapata and Morin also were physically present at the crime scene and the events leading up to the murders, if not the actual shooting. "Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force." (*Clark*, *supra*, 63 Cal.4th at p. 619.) Both factors are present here. Several intermediate steps culminated in the foreseeable murders. Those steps included capturing and restraining the victims at gunpoint, taking money and other property from them, trying to steal more money from the bank account of one victim, beating them, and

driving them to a more remote location. Esparza also exhibited behavior during the crime that suggested a willingness to use lethal force. He threatened to shoot one of the victims when he ordered them to the floor, and he threatened to kill one of them if he was lying about his PIN number for the ATM card.

Despite their proximity to the events leading to the murder, Zapata and Morin failed to use the most obvious opportunity to aid the victims and restrain the crime—they did not call the police and report the victims' location when they went to the ATM, nor did Zapata do that when she left to pick up Esparza's girlfriend. Their proximity to the events leading to the murders thus weighs in favor of the reckless indifference finding.

The duration of the felony also weighs in favor of the reckless indifference finding, because the murders occurred after the victims had been restrained for a prolonged period. "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark*, *supra*, 63 Cal.4th at p. 620.) Again, the victims were restrained for hours, presenting multiple opportunities for violence. (*Montanez*, *supra*, 91 Cal.App.5th at p. 283 [period of 25 minutes was prolonged and weighed in favor of a reckless indifference finding].)

Zapata and Morin also knew that Esparza was likely to kill the victims. Any reasonable person aware of Esparza's fugitive status and history of violence would conclude that he was willing and likely to kill the victims to eliminate them as witnesses. Zapata argues that her knowledge of Esparza's likelihood of killing does not show

43

reckless indifference, because she had no advance knowledge of the robbery and did not voluntarily decide to commit the crime in advance. But her lack of advance knowledge does little to mitigate her culpability, given that she participated in the crime for hours with knowledge of Esparza's likelihood of killing. That willing participation for the long duration of the felony with an individual known to use lethal force thus "give[s] rise to the inference that [she] disregarded a 'grave risk of death.'" (*Clark*, *supra*, 63 Cal.4th at p. 621.)

A defendant's efforts to minimize the risk of violence, the last *Clark* factor, may mitigate culpability. (*Montanez*, *supra*, 91 Cal.App.4th at p. 284.) Zapata and Morin rely heavily on the evidence that they made such efforts, like calling Aguilar to try to deescalate the situation and suggesting that they drive the victims across the Mexican border. "But the existence of evidence that defendant[s] made some effort to minimize the risk of violence does not, in itself, necessarily foreclose a finding that [they] acted with reckless indifference to human life." (*Clark*, *supra*, 63 Cal.4th at p. 622.) That is because reckless indifference implicates both subjective and objective components. (*Ibid.*) Although some degree of subjective awareness of the grave risk to life is required, it is the factfinder's "objective determination that ultimately determines recklessness." (*Ibid.*) Accordingly, "it would be possible for the defendant to have engaged in apparent efforts to minimize the risk of violence but still be determined by the [factfinder] to have been reckless, given all the circumstances known to [the] defendant surrounding the crime." (*Ibid.*)

That is the case here.  Even if Zapata and Morin believed that they were reducing the risk of violence by calling Aguilar and suggesting the border plan, the court reasonably concluded that their conduct was "'a gross deviation from the standard of conduct that a law-abiding person would observe in [their] situation.'"  (*Clark*, *supra*, 63 Cal.4th at p. 617.)  Aguilar was on the phone from prison.  His ability to control Esparza's actions necessarily was limited.  And the proposed border plan did not preclude the reckless indifference finding.  (See *id.* at p. 623 [accomplices' and shooter's purported agreement that nobody would be hurt was insufficient by itself to foreclose the conclusion that the accomplices might have exhibited reckless indifference].)  The court found that the evidence that Esparza had agreed to the plan lacked credibility, a determination by which we are bound.  Besides, that credibility determination was well founded.  It was unlikely that Esparza would agree to release the victims, in light of his fugitive status.  Morin's conflicting statement that Esparza brushed off the idea was far more credible.  Most importantly, Zapata's and Morin's asserted efforts to lower the risk of violence were paltry compared to the efforts that they declined to make.  As already discussed, they squandered key opportunities to aid the victims and prevent the murders.

Zapata argues that there is insufficient evidence that she had a "'safe'" opportunity to contact authorities, so any conclusion otherwise amounts to speculation.  In addition, she asserts that the court acknowledged the evidence showed only that "maybe" Zapata accompanied Morin to the ATM.  The court's "maybe" comment about the state of the evidence does not assist Zapata.  The court was only acknowledging that Zapata claimed

45

her memory was unclear: Morin testified that Zapata took her to the market, where Morin tried to withdraw money at the ATM. Zapata testified that she went to the market with Morin that day, but she could not recall when or whether Morin tried to use the ATM card. Morin's statements alone constituted substantial evidence that both defendants went to the ATM, and Zapata's statements were consistent with Morin's account.

Moreover, the argument about the safety of squandered opportunities to aid the victims disregards the substantial evidence standard of review. Zapata relies on inferences that support her position. From Esparza's statement that he was not returning to prison, she infers that he was willing to die rather than face arrest. From there she concludes that it was not safe to call the police, because Esparza would react violently to their presence. But the court could reasonably conclude that a law-abiding person in Zapata's situation would see no apparent danger in calling police and reporting the victims' location. Zapata and Esparza left the victims alone at the vineyard, and she parted ways with Esparza shortly after that to pick up his girlfriend. It is unclear why the victims would be unsafe if Esparza was not with them. Esparza was with the victims when Morin and Zapata went to the ATM, but any report to the police could have warned them of the situation—that Esparza was armed and holding two men at gunpoint—so that law enforcement could plan for that. In short, Esparza's claimed unwillingness to return to prison did not compel the conclusion that defendants lacked safe opportunities to aid the victims.

46

Zapata's other arguments similarly rely on evidence or inferences that support her position while disregarding evidence or inferences that support the court's ruling. For instance, she argues that her "fear of Esparza and what he might do" weighs against a finding of reckless indifference. Morin likewise argues that she participated in the robbery out of fear. The arguments do not show that the court erred. To the extent that Zapata and Morin spoke of fear or being afraid, the court concluded that was because they knew that the victims' lives "were in grave danger." That is consistent with their knowledge of Esparza's likelihood of killing, a factor that weighs in favor of finding defendants recklessly indifferent. And like efforts to reduce the risk of lethal violence, a claimed concern for the victims' lives does not preclude the reckless indifference finding. The court could still determine that Zapata and Morin were "reckless, given all the circumstances known to [them] surrounding the crime" (*Clark*, *supra*, 63 Cal.4th at p. 622) and what a law-abiding person would do in that situation (*id*. at p. 617).

Zapata also reiterates the argument that she participated in the robbery and complied with Esparza's directions only to prevent the situation from escalating and to ensure the victims' safety. The idea that she participated in the robbery essentially for the victims' sake fails to persuade. Even if Zapata believed that assisting Esparza mitigated the grave risk to the victims' lives, "a defendant's good faith but unreasonable belief that he or she was not posing a risk to human life in pursuing the felony does not suffice to foreclose a determination of reckless indifference to human life." (*Clark*, *supra*, 63 Cal.4th at p. 622.)

For all of these reasons, the record contains substantial evidence that Zapata and Morin acted with reckless indifference to human life.

IV.   *Claimed misapplication of the legal standards*

Zapata argues that the court misapplied the legal standards under *Banks* and *Clark*. She contends that we must reverse the court's order and remand for the court to correctly apply the legal standards, assuming that we reject her substantial evidence challenge. (Morin joins the argument in her reply brief.)  The argument is meritless.

Zapata first argues that the court incorrectly treated her efforts to minimize violence as showing that she acted with reckless indifference, and it failed to consider whether those efforts mitigated her culpability.  She focuses in isolation on the following comment that the court made in explaining its ruling:  "It's very difficult to take the position that you didn't know what was going [to] happen when you are so scared that it is going to happen and you say that you took actions to prevent it.  Those things just don't go together."

Zapata claims that the court misapplied *Clark*, but the comment does not show that the court misapplied the law.  Rather, the comment responded to the parties' arguments and recognized the different inferences that could be drawn from the evidence.  At the hearing on defendants' petitions, the People argued that a reasonable person could not commit a violent crime with a known killer and then say that they did not believe the crime involved a grave risk of death.  Zapata argued that there was no evidence that she knew Esparza "actually killed" anyone.  She further argued that all participants

48

understood that they were taking the victims to the Mexican border town, not driving the victims out to kill them. Similarly, Morin argued that she reasonably believed the victims were going to be dropped off somewhere alive.

The court's comment was a rejection of Zapata's and Morin's position. That is, it was not credible to say that they were unaware of Esparza's likelihood of killing or the grave risk to the victims' lives, when they claimed that their concern for the victims' lives motivated them to call Aguilar or make other efforts.

Zapata's and Morin's stated reasons for their actions were undeniably relevant to their subjective knowledge of the dangerousness of the crime. (See *Anderson*, *supra*, 28 Cal.4th at p. 780 [the reasons for a person's actions "are highly relevant to whether the person acted with a conscious or wanton disregard for human life"].) And any assertion that *Clark* prohibits the factfinder from considering a defendant's stated reasons in that way is incorrect. There was no evidence in *Clark* that the defendant knew the shooter had a propensity for violence, no evidence that the shooter even had such a propensity, and no opportunity for the defendant to observe anything in the shooter's actions during the crime that would have indicated a likelihood of killing. (*Clark*, *supra*, 63 Cal.4th at p. 621.) The defendant thus made efforts to minimize violence without any knowledge that his confederate was likely to kill (*id*. at pp. 621-622), so the court had no occasion to discuss the inferences that could be drawn in a case involving a known propensity for violence.

49

In any event, the court's comment does not mean that the court failed to consider whether Zapata's and Morin's efforts to minimize violence also mitigated their culpability. The court was well aware of *Banks* and *Clark*. All of the parties discussed the cases at length in their briefs and referred to them at the hearing. We have no reason to conclude that the court was unaware of our high court's directions on how to apply the relevant factors. To reiterate, the court was required to consider efforts to minimize violence "as being part of all the relevant circumstances" bearing on reckless indifference to human life, but evidence of such efforts does not necessarily foreclose a finding of reckless indifference. (*Clark*, *supra*, 63 Cal.4th at p. 622.) A fair reading of the entirety of the court's comments demonstrates that the court weighed defendants' efforts and concluded that they did not outweigh other factors establishing reckless indifference. That determination was well supported by substantial evidence. (See Discussion part III.B, *ante*.)

Zapata next argues that the court erred by refusing to consider whether her fear of Esparza weighed against finding her a major participant who acted with reckless indifference to human life. The argument focuses again on one comment in isolation. Specifically, the court stated that Morin said she did not call the police because she was scared, which "just highlight[ed] her actual subjective fear, her actual subjective knowledge of what was going on." The court then observed: "Being scared of not helping doesn't excuse one from not helping. It doesn't take you away from being a

50

major participant.  It doesn't take you away from acting with reckless indifference to human life."

The court was making the point that Morin's claimed fear for the victims' lives showed that she subjectively knew Esparza was likely to kill the victims.  That was a proper and reasonable inference to draw from the evidence.  And fairly reading the court's comments, the court merely meant that it had considered the evidence of Morin's fear for the victims' lives and nevertheless found that she was still a major participant who acted with reckless indifference.  The comments were about the weight of the evidence in this case.  The court was not declaring a rule that a defendant's fear can never be a mitigating factor in any case.

In sum, we reject Zapata's claim of legal error.  The record does not support Zapata's argument that the court misapplied the relevant factors under *Banks* or *Clark*.

V.     *Consideration of Morin's youth*

Morin argues that we must remand the matter for the court to consider whether her youth affected her ability to form the requisite mental state.  We reject the argument.  To the extent that the court was required to consider her youth and failed to do so, any such error was harmless.

A.      *Forfeiture*

As a threshold matter, the People contend that Morin forfeited the argument.  They point out that although she mentioned her age several times at the evidentiary hearing,

she failed to argue specifically that her youth weighed against a reckless indifference finding.

We decline to find that Morin forfeited the argument. The hearing on Morin's petition occurred in June 2022, and the court denied the petition that same day. At the time, the case law holding that "youth is a relevant factor in determining whether the defendant acted with reckless indifference to human life" involved juvenile defendants. (*In re Moore* (2021) 68 Cal.App.5th 434, 454 (*Moore*) [16-year-old defendant]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 987, 991 [15-year-old defendant].) Later case law extended the same reasoning to young adult defendants who committed their offenses between the ages of 18 and 25. (*People v. Jimenez* (2024) 103 Cal.App.5th 994, 1002-1004 [describing cases in July 2022 and later that concluded youth was a relevant factor with respect to young adult defendants].) In addition, later case law involving young adults expressly concluded that "youthful age *must* be considered" along with the *Banks* and *Clark* factors (*People v. Jones* (2022) 86 Cal.App.5th 1076, 1088, fn. 7, italics added (*Jones*)), not just that youth is a relevant factor that may be considered. Considering those later developments in the law, we do not fault Morin for failing to make a more specific argument about her youth. (*People v. Oliver* (2023) 90 Cal.App.5th 466, 488 (*Oliver*) [declining to apply forfeiture because the case law holding that youth was relevant postdated the trial court proceedings].)

B.      *Any failure to consider youth was harmless*

We need not decide whether the court was required to consider Morin's youth or whether it was a factor that the court "*may* consider under the totality of the circumstances." (*In re Harper* (2022) 76 Cal.App.5th 450, 470.)  Assuming that it was a mandatory consideration, any failure to consider her youth was harmless on this record. That is, it is not reasonably probable that the court would have reached a different result if it had focused on Morin's age when analyzing reckless indifference. (*Oliver*, *supra*, 90 Cal.App.5th at pp. 489-490 & fn. 8.)

A defendant's youth may be relevant in determining whether they were recklessly indifferent to human life because of "the 'hallmark features' of youth—'among them, immaturity, impetuosity, and failure to appreciate risks and consequences.'" (*Moore*, *supra*, 68 Cal.App.4th at p. 454.)  Other cases have similarly described how a youth's lack of maturity and underdeveloped sense of responsibility may lead to ""recklessness, impulsivity, and heedless risk-taking.""" (E.g., *People v. Keel* (2022) 84 Cal.App.5th 546, 562; *Oliver*, *supra*, 90 Cal.App.5th at p. 485 [research into juvenile minds showed "'transient rashness, proclivity for risk, and inability to assess consequences'"].)  Scientific evidence shows that areas of the brain affecting judgment and decisionmaking do not develop until the early to mid-20s.  (*Oliver*, at p. 486.)

But "[p]resumably, the presumption of immaturity weakens as a defendant approaches 26." (*Oliver*, *supra*, 90 Cal.App.5th at p. 489.)  Morin was 23 years old at the time of the offenses, not a 15 or 16 year old.  And she was not participating in a crime

with juveniles, which might have supported an inference of immaturity. (See *People v. Pittman* (2023) 96 Cal.App.5th 400, 418 [confederates of 21-year-old defendant were 16 and 17 years old, giving rise to inferences of immaturity and peer pressure].) Zapata was 39 years old, and we can infer that Esparza was around the same age as Morin.[4]

In addition, the record demonstrates that Morin was not lacking in experience, as juveniles generally have been presumed to be. (See *Moore*, *supra*, 68 Cal.App.4th at p. 454 [the 16-year-old defendant "lacked '"the experience, perspective, and judgment"'" to adequately appreciate the risk of death posed by his criminal activities"].) She was working as a prostitute, and there was evidence that she had participated in an earlier robbery with Esparza. She thus was not without criminal sophistication. (See *Jones*, *supra*, 86 Cal.App.5th at p. 1091 [evidence that 20-year-old defendant "appeared to be impulsive rather than criminally sophisticated"].)

Most notably, Morin's actions do not show a transient rashness or a failure to appreciate risks and consequences. The duration of the crime alone shows that she had time to deliberate and consider her options and still chose to participate. Her call to Aguilar and her suggestion that they drive the victims to the border also show that she

---

[4] At Esparza's trial in March 2014, Zapata testified that she had known Esparza for more than 10 years, and he was 15 or 16 when she met him. If she met him 10 years before the trial (which took place in 2014), and he was 15 years old when they met, then he would have been roughly 20 years old when they committed the offenses (in December 2009). But he likely was older than that. Morin had known Esparza since she was 15 years old. Assuming that mother and daughter met him around the same time, he also would have been 15 years old, according to Zapata's testimony. He thus would have been around the same age as Morin at the time of the offenses.

was well aware of the particular risks posed by the crime and by her confederate, Esparza.

Morin nevertheless argues that calling Aguilar and suggesting the border plan demonstrate the opposite—that she failed to realistically appreciate risks and consequences. She suggests that she should have known that those would be ineffective measures. We disagree that those actions show a youthful failure to assess risk. Zapata, who was 39 years old, made the same choices; she also wanted to enlist Aguilar and discussed the border plan. Further, those actions were calculated risks, even if they did not turn out as Morin hoped. Again, she had hours to reflect on her options. They were not spur of the moment decisions.

Morin additionally argues that her decision to harbor Esparza shows the hallmarks of youth, like impulsivity, vulnerability to peer pressure, and failure to appreciate risk. We also disagree with that characterization of her actions. There is no evidence that she spontaneously made the decision to harbor him without any thought of the risks. Indeed, the evidence demonstrates that she considered the risks and took measures to mitigate them. She sent her children away. She asked him to stay inside the trailer during the day. And she limited her visitors so that he would not be discovered. The record thus shows that she made the deliberate decision to harbor Esparza because she thought of him as family and would have done the same for any family member.

"[A]t bottom, age is just a proxy for maturity." (*Oliver*, *supra*, 90 Cal.App.5th at p. 490) The record does not support the conclusion that Morin was so immature that she

failed to appreciate the dangers of her confederate's actions or her own. Under the circumstances here, there is no reasonable probability that Morin would have obtained a better result if the court had focused on her age when determining reckless indifference. Any failure to consider her age therefore was harmless.

## DISPOSITION

The order denying Zapata's and Morin's petitions for resentencing under section 1172.6 is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.